1
2
3
4
5

Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

6
7

*Counsel for Plaintiff*

8

[Additional Counsel on Signature Page]

9
10

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| ANAND ROY, derivatively on behalf of MATCH GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> BERNARD KIM, GARY SWIDLER, STEPHEN BAILEY, MELISSA BRENNER, SHARMISTHA DUBEY, LAURA JONES, ANN L. MCDANIEL, THOMAS J. MCINERNEY, WENDI MURDOCH, SPENCER RASCOFF, GLENN SCHIFFMAN, PAMELA S. SEYMON, and ALAN G. SPOON, <br><br> Defendants, <br><br> and <br><br> MATCH GROUP, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

## INTRODUCTION

Plaintiff Anand Roy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Match Group, Inc. ("Match" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Bernard Kim ("Kim"), Gary Swidler ("Swidler"), Stephen Bailey ("Bailey"), Melissa Brenner ("Brenner"), Sharmistha Dubey ("Dubey"), Laura Jones ("Jones"), Ann L. McDaniel ("McDaniel"), Thomas J. McInerney ("McInerney"), Wendi Murdoch ("Murdoch"), Spencer Rascoff ("Rascoff"), Glenn Schiffman ("Schiffman"), Pamela S. Seymon ("Seymon"), and Alan G. Spoon ("Spoon") (collectively, the "Individual Defendants," and together with Match, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Match, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Kim and Swidler for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Match, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 2, 2023 and November 7, 2024,

inclusive (the "Relevant Period").

2.    Match is an online dating services provider that connects people through its brands such as Tinder, Match.com, OkCupid, and Hinge. Match derives most of its revenue through subscription services, online advertising, and in-app purchases.

3.    Match discloses its growth to investors in its SEC filings and other public disclosures by highlighting its monthly active users ("MAU") on each platform. The Company utilizes MAU and the average revenue per user as the primary operating metrics in evaluating the performance of a given platform.

4.    The Relevant Period began on May 2, 2023 when the Company published a shareholder letter announcing the Company's financial results (the "Q1 2023 Shareholder Letter") for the first quarter of the fiscal year ended December 31, 2023 (the "2023 Fiscal Year") which discussed Tinder's performance and its ability to bring back users who have otherwise "lapsed," stating:

> While Tinder is an iconic brand used by many, our data shows that approximately 40% of eligible singles age 18 to 34 in North America and Europe are still not using Tinder, and an additional approximately 35% have used Tinder previously, but not in the last year ("lapsed users"). This provides ample opportunity for Tinder to bring both singles who have never tried the app and lapsed users into the fold. ***Tinder has a strong history of reactivating lapsed users, and the large pool of lapsed users provides significant opportunity to increase reactivations. The way for Tinder to attract new and lapsed users is to deliver exciting features and a product experience that resonates. We're confident that as Tinder does so, it can both return to stronger new user growth and reactivate the large population of lapsed users, which will ultimately drive revenue growth***.[1]

5.    However, throughout the Relevant Period, the Individual Defendants consistently understated the hurdles encountered by Match regarding declining MAU on the Tinder platform.

6.    The truth began emerging on November 6, 2024 when Match published a shareholder letter announcing the Company's financial results (the "Q3 2024 Shareholder

---

[1] Unless otherwise stated, all emphasis added.

Letter") for the third quarter of the fiscal year ended December 31, 2024 (the "2024 Fiscal Year"). The Q3 2024 Shareholder Letter revealed, *inter alia*, that "Tinder MAU was down 9% Y/Y in Q3, which was the same rate of decline as in Q2, falling short of our expectations for continued improvement in Y/Y trends."

7.     The following day, on November 7, 2024, the truth fully emerged when Investopedia published an article reporting that, in the third quarter of the 2024 Fiscal Year, Tinder's "monthly active users (MAU) declined 9% from the same time last year and its revenue per payer (RPP) grew less than expected."

8.     On this news, the Company's stock price fell $6.77 per share, or 17.8%, from a closing price of $37.88 per share on November 6, 2024 to close at $31.11 per share on November 7, 2024.

9.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was facing greater challenges in generating user growth for Tinder than was otherwise being represented; (2) because of this, there was a significant risk that Tinder's MAU would be unable to recover by the time the Company had to report its financial results for the third quarter of the 2024 Fiscal Year; (3) Tinder was facing additional issues regarding its average revenue per user; and (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of a new Stock and Annual Incentive Plan (the "2024 Stock Plan"). As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering

them personally liable to the Company for breaching their fiduciary duties.

11.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Match to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between May 2023 and September 2024, approximately 18.7 million shares of Match common stock were repurchased at artificially inflated prices, costing the Company approximately $723 million. As the Company's stock was actually worth only $31.11 per share, the price at which it was trading when markets closed on November 7, 2024, the Company overpaid for repurchases of its own stock by approximately $140 million in total.

12.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while one of the Individual Defendants engaged in improper insider sales, netting total proceeds of ***approximately $400,255***.

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its President/Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.     In light of the breaches of fiduciary duty engaged in by the Individual

Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Kim's and Defendant Swidler's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Match is headquartered in this District.

## PARTIES

### Plaintiff

21.    Plaintiff is a current shareholder of Match. Plaintiff has continuously held

Match common stock at all relevant times.

**Nominal Defendant Match**

22.    Match is a Delaware corporation with principal executive offices at 8750 North Central Expressway, Suite 1400, Dallas, Texas, 75231. Match's common stock trades on the Nasdaq Globa Market ("NASDAQ") under the ticker symbol "MTCH."

**Defendant Kim**

23.    Defendant Kim has served as Match's CEO and as a Company director since May 2022. According to the Schedule 14A the Company filed with the SEC on April 29, 2024 (the "2024 Proxy Statement"), as of April 22, 2024, Defendant Kim beneficially owned 119,564 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $31.96, Defendant Kim owned approximately $3.8 million worth of Match stock as of that date.

24.    For the 2023 Fiscal Year, Defendant Kim received $16,080,272 in total compensation from the Company. This included $1,000,000 in salary, $1,860,000 in bonus, $13,210,272 in stock awards, and $10,000 in all other compensation.

25.    The 2024 Proxy Statement stated the following about Defendant Kim:

*Bernard Kim*, age 47, has served as Chief Executive Officer and a director of Match Group since May 2022. Prior to that time, Mr. Kim served as President of Publishing of Zynga Inc., a mobile video game developer, from June 2016 until May 2022, where he oversaw various functions including global marketing, user acquisition, revenue, communications, consumer insights, data science, product management, and mergers and acquisitions. Prior to joining Zynga, Mr. Kim spent nearly 10 years at Electronic Arts Inc. ("EA") as the company's Senior Vice President of Mobile Publishing. In that role, he oversaw EA's mobile distribution, strategy, product management, analytics, network engagement, marketing, revenue demand planning, business development, third-party publishing, and mergers and acquisitions. Before joining EA, Mr. Kim served as Director of Sales and Channel Strategy at The Walt Disney Company, where he led sales and retail for Disney Mobile. Mr. Kim has served on the board of directors of Five Below, Inc. since June 2022. Mr. Kim holds an undergraduate degree in both economics and communications from Boston College. In determining that Mr. Kim should serve as a director, the Nominating Committee and the Board considered his

position as Chief Executive Officer of the Company as well as his considerable experience managing operations and strategic planning in the mobile application and interactive entertainment industry.

**Defendant Swidler**

26.    Defendant Swidler has served as the Company's President and CFO since January 2023. Defendant Swidler previously served as the Company's  CFO from September 2015 until March 2020, and then as the Company's Chief Operating Officer and CFO from March 2020 to January 2023. Defendant Swidler will transition out of his CFO role on March 1, 2025. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Swidler beneficially owned 469,441 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $31.96, Defendant Swidler owned approximately $15 million worth of Match stock as of that date.

27.    For the 2023 Fiscal Year, Defendant Swidler received $12,993,695 in total compensation from the Company. This included $675,000 in salary, $1,255,500 in bonus, $11,053,195 in stock awards, and $10,000 in all other compensation.

28.    The 2024 Proxy Statement stated the following about Defendant Swidler:

*Gary Swidler*, age 53, has served as President and Chief Financial Officer of Match Group since January 2023. Prior to that time, Mr. Swidler served as Match Group's Chief Operating Officer and Chief Financial Officer from March 2020; and prior to that, he served as Chief Financial Officer of Match Group from September 2015. Prior to joining Match Group, Mr. Swidler was a Managing Director and Head of the Financial Institutions Investment Banking Group at Bank of America Merrill Lynch ("Merrill Lynch") from April 2014 to August 2015. Prior to that, Mr. Swidler held a variety of positions at Merrill Lynch and its predecessors since 1997, most recently as Managing Director and Head of Specialty Finance from April 2009 to April 2014. Prior to joining Merrill Lynch, Mr. Swidler was an associate at the law firm of Wachtell, Lipton, Rosen & Katz. Mr. Swidler has served on the board of directors of DoubleVerify Holdings, Inc. since February 2024. Mr. Swidler has a BSE from the Wharton School at the University of Pennsylvania and a JD from New York University School of Law.

**Defendant Bailey**

29.     Defendant Bailey has served as a Company director since June 2020. He also serves as a member of the Audit Committee. On March 1, 2025, Defendant Bailey is set to take over as CFO of the Company. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Bailey beneficially owned 7,111 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $31.96, Defendant Bailey owned approximately $227,268 worth of Match stock as of that date.

30.     For the 2023 Fiscal Year, Defendant Bailey received $309,973 in total compensation from the Company. This included $60,000 in fees paid in cash and $249,973 in stock awards.

31.     The 2024 Proxy Statement stated the following about Defendant Bailey:

*Stephen Bailey*, age 44, has been a director of Match Group since June 2020. Mr. Bailey has served as Founder and Chief Executive Officer of ExecOnline, Inc., a leading provider of B2B leadership development solutions, since 2011. Prior to that he served as Chief Executive Officer and Chief Product Officer of Frontier Strategy Group, LLC, a software and information services business, from January 2006 to May 2011. Before joining Frontier Strategy Group, Mr. Bailey was an associate in the venture capital and private equity group of WilmerHale. Mr. Bailey has served on the board of directors of Ibotta, Inc. since February 2024. In determining that Mr. Bailey should serve as a director, the Nominating Committee and the Board considered his extensive executive management experience, which the Nominating Committee and the Board believe gives him insight into business strategy, leadership and marketing.

### Defendant Brenner

32.     Defendant Brenner has served as a Company director since June 2020. She also serves as a member of the Compensation and Human Resources Committee ("Compensation Committee"). According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Brenner beneficially owned 7,111 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading

on April 22, 2024 was $31.96, Defendant Brenner owned approximately $227,268 worth of Match stock as of that date.

33.   For the 2023 Fiscal Year, Defendant Brenner received $304,973 in total compensation from the Company. This included $55,000 in fees paid in cash and $249,973 in stock awards.

34.   The 2024 Proxy Statement stated the following about Defendant Brenner:

*Melissa Brenner*, age 49, has been a director of Match Group since June 2020. Since January 2018, Ms. Brenner has served as Executive Vice President, Digital Media for the National Basketball Association ("NBA"), where she leads the development, oversight and implementation of the NBA's global digital strategy and emerging technology initiatives. Ms. Brenner led the NBA's social media portfolio as the league became one of the largest social media communities in the world. In addition, Ms. Brenner has led the digital products team on the execution of the NBA app and website. Ms. Brenner has held positions of increasing responsibility with the NBA since 1997, including Senior Vice President, Digital Media from February 2014 to December 2017, Senior Vice President, Marketing from February 2013 to January 2014, and Vice President, Marketing from October 2007 to January 2013. In determining that Ms. Brenner should serve as a director, the Nominating Committee and the Board considered her extensive marketing and executive management expertise as well as her experience in social media and digital products.

**Defendant Dubey**

35.   Defendant Dubey has served as a Company director since September 2019. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Dubey beneficially owned 390,264 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $31.96, Defendant Dubey owned approximately $12.5 million worth of Match stock as of that date.

36.   For the 2023 Fiscal Year, Defendant Dubey received $299,973 in total compensation from the Company. This included $50,000 in fees paid in cash and $249,973 in stock awards.

37.     The 2024 Proxy Statement stated the following about Defendant Dubey:

*Sharmistha Dubey*, age 53, has been a director of Match Group since September 2019. Ms. Dubey has served as an Operating Partner of Advent International, a global private equity investing firm, since October 2022. Prior to that time, Ms. Dubey served as Chief Executive Officer of Match Group from March 2020 to May 2022. Prior to that, Ms. Dubey served as President of Match Group from January 2018, as Chief Operating Officer of Tinder from February 2017 to January 2018 and as President of Match Group Americas, where she oversaw the product and business operations for North American dating properties, including the Match U.S. brand, Plenty Of Fish, OkCupid and Match Affinity Brands, from December 2015 to January 2018. Prior to that, she served in multiple roles within the Company: Chief Product Officer of The Princeton Review and Tutor.com from July 2014 to December 2015; Executive Vice President of Tutor.com from April 2013 to July 2014; Chief Product Officer of Match.com from January 2013 through April 2013 and Senior Vice President, Match.com and Chemistry.com from September 2008 through December 2012. Ms. Dubey has served on the boards of directors of Fortive Corporation since August 2020, Naspers Limited since April 2022 and Prosus N.V. since August 2022. She holds an undergraduate degree in engineering from the Indian Institute of Technology and a master's in engineering from Ohio State University. In determining that Ms. Dubey should serve as a director, the Nominating Committee and the Board considered her past position as Chief Executive Officer of the Company as well as her considerable experience managing operations and strategic planning, including in her prior roles within the Company.

**Defendant Jones**

38.     Defendant Jones has served as a Company director since March 2024.

39.     The 2024 Proxy Statement stated the following about Defendant Jones:

*Laura Jones*, age 42, has been a director of Match Group since March 2024. Ms. Jones has served as Chief Marketing Officer of Instacart, a grocery delivery and pickup service, since July 2022. Prior to that time, Ms. Jones served as Head of Marketing and VP, Brand & Marketing of Instacart from June 2021 to July 2022. Prior to joining Instacart, Ms. Jones served in multiple positions of increasing responsibility with Uber, a multinational transportation company, including leading global marketing for Rides from 2019 to 2021 and various senior marketing roles from 2015 to 2018. At Uber, Ms. Jones built the global product marketing team from

the ground up, spanning the entire product portfolio (Rides, Eats, Freight, etc). Prior to Uber, Ms. Jones served in various senior marketing positions at Google and Visa. Ms. Jones graduated from Dartmouth College with a Bachelor's degree in Economics and Government and received her Masters in Business Administration from Stanford University. In determining that Ms. Jones should serve as a director, the Nominating Committee and the Board considered her significant expertise in marketing and the consumer internet industry as well as her experience with brand refreshes.

**Defendant McDaniel**

40.    Defendant McDaniel has served as a Company director since December 2015. She also serves as the Chair of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant McDaniel beneficially owned 13,101 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $31.96, Defendant McDaniel owned approximately $418,708 worth of Match stock as of that date.

41.    For the 2023 Fiscal Year, Defendant McDaniel received $329,973 in total compensation from the Company. This included $80,000 in fees paid in cash and $249,973 in stock awards.

42.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant McDaniel made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| August 9, 2023 | 8,735 | $45.82 | $400,255 |

Thus, in total, before the fraud was exposed, Defendant McDaniel sold 8,735 shares of Company stock on inside information, for which she received approximately $400,255 in total proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in

facilitating and participating in the scheme.

43.    The 2024 Proxy Statement stated the following about Defendant McDaniel:

*Ann L. McDaniel*, age 68, has been a director of Match Group since December 2015. Ms. McDaniel currently serves as a consultant to Graham Holdings Company and previously served as Senior Vice President of Graham Holdings Company (and its predecessor companies) from June 2008 to April 2015. Prior to that time, Ms. McDaniel served as Vice President-Human Resources of Graham Holdings Company from September 2001. Ms. McDaniel also served as Managing Director of Newsweek, Inc., a Graham Holdings Company property, from January 2008 until its sale in September 2010, and prior to that time, held various editorial positions at Newsweek. In determining that Ms. McDaniel should serve as a director, the Nominating Committee and the Board considered her extensive human resources experience, which the Nominating Committee and the Board believe give her particular insight into personnel and compensation matters, as well as her management experience with Newsweek, which the Nominating Committee and the Board believe gives her insight into business strategy, leadership and marketing.

**Defendant McInerney**

44.    Defendant McInerney has served as the Chairman of the Board since May 2021, and has been a Company director since November 2015. He also serves as the Chair of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant McInerney beneficially owned 337,954 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $31.96, Defendant McInerney owned approximately $10.8 million worth of Match stock as of that date.

45.    For the 2023 Fiscal Year, Defendant McInerney received $389,973 in total compensation from the Company. This included $140,000 in fees paid in cash and $249,973 in stock awards.

46.    The 2024 Proxy Statement stated the following about Defendant McInerney:

*Thomas J. McInerney*, age 59, has been Chairman of the Board of Match Group since May 2021 and has served as a director of Match Group since November 2015. Mr. McInerney served as Chief Executive Officer of

Altaba Inc., a publicly traded registered investment company and the successor company to Yahoo! Inc., from June 2017 to December 2021. Mr. McInerney previously served as Executive Vice President and Chief Financial Officer of the company formerly known as IAC/InterActiveCorp ("Former IAC") from January 2005 to March 2012. From January 2003 through December 2005, he served as Chief Executive Officer of the retailing division of Former IAC, which included HSN, Inc. and Cornerstone Brands. From May 1999 to January 2003, Mr. McInerney served as Executive Vice President and Chief Financial Officer of Ticketmaster, formerly Ticketmaster Online CitySearch, Inc., a live entertainment ticketing and marketing company. From 1986 to 1988 and from 1990 to 1999, Mr. McInerney worked at Morgan Stanley, a global financial services firm, most recently as Principal. Mr. McInerney has served on the board of directors of Altaba Inc. since June 2017, where he currently serves as the Chairman of the Board since January 2022. In determining that Mr. McInerney should serve as a director, the Nominating Committee and the Board considered his extensive senior leadership experience at Former IAC and his related knowledge and experience regarding Match Group, as well as his high level of financial literacy and expertise regarding restructurings, mergers and acquisitions and operations, and his public company board and committee experience.

**Defendant Murdoch**

47.    Defendant Murdoch served as a Company director from June 2020 until the annual meeting on June 21, 2024. During her time on the Board, she also served as Chair of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Murdoch beneficially owned 6,611 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $31.96, Defendant Murdoch owned approximately $211,288 worth of Match stock as of that date.

48.    For the 2023 Fiscal Year, Defendant Murdoch received $319,973 in total compensation from the Company. This included $35,000 in fees paid in cash, $35,000 in fees deferred, and $249,973 in stock awards.

49.    The 2024 Proxy Statement stated the following about Defendant Murdoch:

*Wendi Murdoch*, age 55, has been a director of Match Group since June

2020. Ms. Murdoch is an entrepreneur and investor. Since 2009, Ms. Murdoch has served as cofounder and board member of Artsy, an online platform for collecting, discovering and selling art that partners with over 4,500 art museums, galleries, art fairs and auction houses. From 2005 to 2012, Ms. Murdoch worked as an advisor for News Corporation's businesses and investments in China. Throughout her career, Ms. Murdoch has applied her business expertise to advise and invest in technology and other companies in Asia and the United States. Ms. Murdoch is also an award-winning producer and produced the Netflix documentary "Sky Ladder," which premiered at the 2016 Sundance Film Festival. Ms. Murdoch holds an MBA from Yale University's School of Management. In determining that Ms. Murdoch should serve as a director, the Nominating Committee and the Board considered her investment and business expertise, including with respect to Asian markets.

**Defendant Rascoff**

50.    Defendant Rascoff has served as a Company director since March 2024.

51.    The 2024 Proxy Statement stated the following about Defendant Rascoff:

*Spencer Rascoff*, age 48, has been a director of Match Group since March 2024. Mr. Rascoff is a co-founder of 75 & Sunny Ventures, a startup studio and venture capital firm, where he has served as CEO since May 2021. Through 75 & Sunny Ventures, Mr. Rascoff is an active angel investor in over 50 companies. Mr. Rascoff is also a co-founder of Pacaso, a marketplace for vacation home ownership, where he has served as Chair since September 2020, as well as founder of several early-stage startups. Mr. Rascoff co-founded Zillow, a technology real estate marketplace company, in 2005 and served as its CEO for 10 years. During Mr. Rascoff's time as CEO, Zillow won dozens of "best places to work" awards as it grew to over 4,500 employees, $3 billion in revenue and $10 billion in market capitalization. Prior to Zillow, Mr. Rascoff co-founded and was VP, Corporate Development of Hotwire, a travel website, which was sold to Expedia in 2003. Mr. Rascoff is also a visiting professor at Harvard where he teaches classes on entrepreneurship and startups. Mr. Rascoff graduated from Harvard University with a Bachelor's degree in Government. Mr. Rascoff previously served as a member of the boards of directors of Zillow Group, Inc. from July 2011 through April 2020, Palantir Technologies Inc. from July 2020 through June 2022, TripAdvisor, Inc. from 2013 through June 2020, Supernova Partners Acquisition Company, Inc. from August 2020 through September 2021, Supernova Partners Acquisition Company II, Ltd. from December 2020 through March 2022, and Supernova Partners

Acquisition Company III, Ltd. from March 2021 through April 2023. In determining that Mr. Rascoff should serve as a director, the Nominating Committee and the Board considered his significant experience as an entrepreneur and his proven track record of building and scaling consumer internet businesses.

**Defendant Schiffman**

52.    Defendant Schiffman has served as a Company director since September 2016. He also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Schiffman beneficially owned 267,117 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $31.96, Defendant Schiffman owned approximately $8.5 million worth of Match stock as of that date.

53.    For the 2023 Fiscal Year, Defendant Schiffman received $299,973 in total compensation from the Company. This included $50,000 in fees deferred and $249,973 in stock awards.

54.    The 2024 Proxy Statement stated the following about Defendant Schiffman: *Glenn H. Schiffman*, age 54, has been a director of Match Group since September 2016. Mr. Schiffman has served as Executive Vice President and Chief Financial Officer of Fanatics, Inc., a global digital sports platform, since August 2021. As Chief Financial Officer of Fanatics, Mr. Schiffman is responsible for a broad set of financial and corporate functions across the entire Fanatics global enterprise, including corporate finance, M&A, treasury, financial planning and analysis, investor relations, accounting, information and physical security, real estate, human resources, legal and corporate administration. He drives the financial direction of the company as it expands beyond commerce into new verticals across the sports ecosystem to become a leading global digital sports platform. Prior to Fanatics, Mr. Schiffman served as Executive Vice President and Chief Financial Officer of IAC, Inc. ("IAC") (and its predecessors), a holding company that owns multiple digital products and brands, from April 2016 to August 2021 and as Chief Financial Officer of Angi Inc., a company that connects home service professionals with consumers, from September 2017 to August 2019 and from February 2021 to July 2021. Previously, Mr. Schiffman spent 25 years as an investment banker, holding various leadership and management roles with organizations including Guggenheim Securities, The Raine Group, Nomura, where he ran

the Asian and subsequently the North and South America Investment Banking business, and Lehman Brothers, where he ran Asia Investment Banking and previously he ran the Global Media Group. Mr. Schiffman has served on the boards of directors of Angi Inc. and Vimeo, Inc. since June 2017 and May 2021, respectively, including serving as Chairman of the Board of Vimeo, Inc. since March 2023. Mr. Schiffman was named Institutional Investor's CFO of the Year of the Midcap Internet Sector in 2018 and 2021. In Mr. Schiffman's philanthropic efforts, he focuses on endowing organizations and funding initiatives with permanent capital to make lasting change. He founded and is Chairman of the Valerie Fund Endowment, which supports children with cancer and blood disorders, created an endowment at the Duke Medical Center to research and hopefully someday cure pediatric cancer, created an endowment at Washington & Lee to support Women's Athletics, and created an endowment at Duke University to fund scholarships for athletes from underrepresented communities. In determining that Mr. Schiffman should serve as a director, the Nominating Committee and the Board considered the unique knowledge and experience regarding Match Group and its businesses that he gained through his role as Executive Vice President and Chief Financial Officer of IAC, as well as his high level of financial literacy and expertise regarding mergers, acquisitions, investments and other strategic transactions. The Nominating Committee and the Board also considered Mr. Schiffman's investment banking experience, which the Nominating Committee and the Board believe gives him particular insight into trends in capital markets and the technology and media industries.

**Defendant Seymon**

55.     Defendant Seymon has served as a Company director since November 2015. She also serves as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Seymon beneficially owned 76,083 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $31.96, Defendant Seymon owned approximately $2.4 million worth of Match stock as of that date.

56.     For the 2023 Fiscal Year, Defendant Seymon received $304,973 in total compensation from the Company. This included $55,000 in fees paid in cash and $249,973 in stock awards.

57.     The 2024 Proxy Statement stated the following about Defendant Seymon:

*Pamela S. Seymon*, age 68, has been a director of Match Group since November 2015. Ms. Seymon was a partner at Wachtell, Lipton, Rosen & Katz, a New York law firm ("WLRK"), from January 1989 to January 2011, and prior to that time, was an associate at WLRK from 1982. During her tenure at WLRK, Ms. Seymon specialized in corporate law, mergers and acquisitions, securities and corporate governance, and represented public and private corporations on offense as well as defense, in both friendly and unsolicited transactions. Ms. Seymon is a graduate of Wellesley College, where she was a Wellesley Scholar, and New York University School of Law. In determining that Ms. Seymon should serve as a director, the Nominating Committee and the Board considered her extensive experience representing public and private corporations in connection with a wide array of complex, sophisticated and high profile matters, as well as her high level of expertise generally regarding mergers, acquisitions, investments and other strategic transactions.

**Defendant Spoon**

58.    Defendant Spoon has served as a Company director since November 2015. He also serves as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Spoon beneficially owned 292,226 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $31.96, Defendant Spoon owned approximately $9.3 million worth of Match stock as of that date.

59.    For the 2023 Fiscal Year, Defendant Spoon received $334,973 in total compensation from the Company. This included $85,000 in fees paid in cash and $249,973 in stock awards.

60.    The 2024 Proxy Statement stated the following about Defendant Spoon:

*Alan G. Spoon*, age 72, has been a director of Match Group since November 2015. Mr. Spoon served as General Partner and Partner Emeritus of Polaris Partners from 2011 to 2018. He previously served as Managing General Partner of Polaris Partners from 2000 to 2010. Polaris Partners is a private investment firm that provides venture capital and management assistance to development stage information technology and life sciences companies. Mr. Spoon was Chief Operating Officer and a director of The Washington Post

Company (now known as Graham Holdings Company) from March 1991 through May 2000 and served as President from September 1993 through May 2000. Prior to his service in these roles, he held a wide variety of positions at The Washington Post Company, including as President of Newsweek from September 1989 to May 1991. Mr. Spoon has served as a member of the boards of directors of IAC since February 2003 and Danaher Corporation since July 1999, and as Chairman of the board of directors of Fortive Corporation since July 2016. Mr. Spoon previously served as a member of the board of directors of Cable One, Inc. from July 2015 through February 2021. In his not-for-profit affiliations, Mr. Spoon was a member of the Board of Regents at the Smithsonian Institution (formerly Vice Chairman) and is a longtime member of the MIT Corporation, where he serves on its Executive Committee and is Chair of its Risk and Audit Committee. He also serves as a member of the board of directors of the AXIM Collaborative Foundation, successor organization to edX.org (a not-for-profit online education platform sponsored by Harvard and the MIT Corporation). In determining that Mr. Spoon should serve as a director, the Nominating Committee and the Board considered his extensive private and public company board experience and public company management experience, all of which the Nominating Committee and the Board believe give him particular insight into business strategy, leadership and marketing in the media industry. The Nominating Committee and the Board also considered Mr. Spoon's venture capital experience and engagement with the MIT Corporation, which the Nominating Committee and the Board believe give him particular insight into trends in the internet and technology industries, as well as into acquisition strategy and financing.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

61.    By reason of their positions as officers, directors, and/or fiduciaries of Match and because of their ability to control the business and corporate affairs of Match, the Individual Defendants owed Match and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Match in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Match and its shareholders so as to benefit all shareholders equally.

62.    Each director and officer of the Company owes to Match and its shareholders

the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

63.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Match, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

64.    To discharge their duties, the officers and directors of Match were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

65.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Match, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

66.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business

prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

67.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Match were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Match's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Match conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Match and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Match's operations would comply

with all applicable laws and Match's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

68.     Each of the Individual Defendants further owed to Match and its shareholders the duty of loyalty requiring that each favor Match's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

69.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Match and were at all times acting within the course and scope of such agency.

70.     Because of their advisory, executive, managerial, directorial, and controlling positions with Match, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

71.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Match.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

72.     In committing the wrongful acts alleged herein, the Individual Defendants

have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

73.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

74.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Match was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

75.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the

1    wrongdoing.

2    76.    At all relevant times hereto, each of the Individual Defendants was the agent

3    of each of the other Individual Defendants and of Match and was at all times acting within

4    the course and scope of such agency.

5    **MATCH'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

6    ***Match's Code of Conduct***

7    77.    Match's Code of Business Conduct and Ethics (the "Code of Conduct") states

8    that Match is committed to conduct [] business affairs in accordance with not only the

9    requirements of applicable law, but also standards of ethical conduct that will maintain and

10    foster the Company's reputation for honest and straightforward business dealings."

11    78.    Further, the Code of Conduct states that it applies to "all Match Group

12    directors, officers and employees, as well as to directors, officers and employees of each

13    subsidiary of Match Group."

14    79.    In a section titled "Honest, Lawful, and Ethical Conduct," the Code of

15    Conduct states the following, in pertinent part, "[t]he conduct of Covered Persons in

16    performing their duties on behalf of the Company must in all situations, as to all matters

17    and at all times, be honest, lawful and in accordance with high ethical and professional

18    standards."

19    80.    In a section titled "Conflicts of Interest," the Code of Conduct states the

20    following, in pertinent part:

21
22    While it is impossible to foresee every potential conflict that could arise,
      examples of conflicts could include affiliations or investments in competitors,
23    customers, suppliers, or others who do business with the Company. All
      Covered Persons must be sensitive to potential conflicts and avoid them where
24    possible. The Company respects the privacy of its directors, officers and
      employees and their right to engage in outside activities (which expressly
25    include, in the case of non-employee directors, serving as an executive officer,
      employee or director of, and/or maintaining a significant direct or indirect
26    beneficial ownership interest in, another entity) that do not conflict with the
27    interests of, do not interfere with the performance of their duties on behalf of,
28

and do not reflect poorly on the Company. The Company nonetheless has the right and obligation to determine whether a conflict of interest (or improper appearance of a conflict of interest) exists and to take appropriate action to address it.

Before (i) engaging in any material transaction (including the making of a significant direct or indirect investment in another entity) or accepting an executive officer or director position with a non-profit entity, in each case that reasonably could give rise to an actual or apparent conflict of interest, or (ii) accepting an executive officer or director position with another for-profit entity, each Covered Person must provide full and fair disclosure of all relevant facts and circumstances to Match Group's Chief Business Affairs and Legal Officer. After evaluating the reported transaction or relationship, Match Group's Chief Business Affairs and Legal Officer will determine whether it reasonably could give rise to an actual or apparent conflict of interest; and if so, (i) determine whether any protective measures are appropriate, or (ii) in the case of Match Group directors or Company officers reporting directly to Match Group's Chief Executive Officer, make a recommendation to Match Group's Nominating Committee or Chief Executive Officer, respectively, who will make such determination, as appropriate. Any protective measures may include prohibiting such transaction or relationship.

81.    In a section titled "Compliance with Laws, Rules, and Regulations," the Code of Conduct states the following, in pertinent part:

Complying with the law is the foundation on which Match Group's ethical standards are built. It is Match Group's policy to be a good "corporate citizen". All Covered Persons must comply with applicable governmental laws, rules and regulations. Reasons such as "everyone does it" are unacceptable excuses for violating this requirement of this Code.

82.    In a section titled "Insider Trading," the Code of Conduct states the following, in pertinent part:

Covered Persons who, as a result of their employment at or other association with the Company, are in possession of material, non-public information about any publicly traded corporation, including Match Group, may not engage in transactions in the securities of such corporations and should not share such information with anyone who might engage in such transactions. To do so is not only unethical, but also illegal, and could expose you to civil and criminal penalties.

83.    In a section titled "Disclosure, Financial Reporting, and Accounting," the

Code of Conduct states the following, in relevant part:

> The Company is committed to providing full, fair, accurate, timely and understandable disclosure in all reports and documents filed with or submitted to the Securities and Exchange Commission ("SEC") and in all other public communications made by the Company. All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls.

> \* \* \*

> Any Covered Person who learns of any information concerning: (i) sig nificant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data accurately, or (ii) any fraud, whether or not material, involving management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls, shall bring the matter promptly to the attention of a member of the Disclosure Committee.

> Upon receipt of any such information, the Disclosure Committee shall investigate the matter, consult with senior management as warranted, confer with the Audit Committee of Match Group's Board of Directors if appropriate, and ensure that any necessary corrective action is taken.

84.    In a section titled "Waivers of the Code of Business Conduct and Ethics," the Code of Conduct states the following:

> Any waiver of this Code for executive officers or directors of Match Group may be made only by the Match Group Board of Directors or a properly authorized Match Group Board committee and will be promptly disclosed to Match Group stockholders along with reasons for such waiver as required by law or Nasdaq regulation.

85.    In a section titled "Enforcement," the Code of Conduct states the following, in relevant part:

> Reporting Violations. Any Covered Person who learns of information indicating that a violation of this Code has been or is about to be committed must immediately report the facts to the Chief Business Affairs and Legal Officer of Match Group.

> The failure to report a violation of this Code may itself be a violation of this

Code.

86.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Match's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

### Match's Audit Committee Charter

87.    Match's Audit Committee Charter ("Audit Committee Charter") states that the purpose of the Audit Committee is as follows:

(i) the integrity of the financial statements of the Company, (2) the effectiveness of the Company's internal control over financial reporting, (3) the qualifications, performance and independence of the independent registered public accounting firm (the "independent accounting firm"), (4) the performance of the Company's internal audit function, (5) the Company's risk assessment and risk management policies as they relate to financial and other risk exposures, and (6) the Company's compliance with legal and regulatory requirements.

88.    Regarding the Audit Committee's authority and responsibilities with respect the Audit Committee Charter states the following:

1. Review and discuss with management and the independent accounting firm the annual audited financial statements, as well as disclosures made in management's discussion and analysis, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

2. Review and discuss with management and the independent accounting firm the Company's earnings press releases and the results of the independent accounting firm's review of the quarterly financial

statements.

3. Discuss with management and the independent accounting firm significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles.

4. Review and discuss with management and the independent accounting firm any major issues as to the adequacy of the Company's internal controls, including any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls, any special steps adopted in light of these issues and the adequacy of disclosures about changes in internal control over financial reporting.

\* \* \*

6. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

\* \* \*

13. Discuss with management, the Company's senior internal auditing executive and the independent accounting firm the Company's and its subsidiaries' compliance with applicable legal requirements and codes of conduct.

\* \* \*

17. Discuss with the Company's Chief Legal Officer or General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies.

89.     In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit

Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

90.    Match is an online dating services provider that connects people through its brands in the online dating and social networking industry, such as Tinder, Match.com, OkCupid, and Hinge.

91.    Match tracks its growth by tracking the MAU it has on each platform. The Company utilizes MAU and the average revenue per user as the primary operating metrics in evaluating the performance of a given platform. It is these metrics that Match likes to highlight to investors in its SEC filings and other public disclosures.

92.    Match derives most of its revenue through subscription services, online advertising, and in-app purchases. Of all the platforms it owns, Tinder is Match's highest revenue generator, consistently accounting for over half of Match's direct revenue for the past three years.

### False and Misleading Statements

### *May 2, 2023 Shareholder Letter*

93.    On May 2, 2023, Match published the Q1 2023 Shareholder letter, disclosing its financial and operational results for the first quarter of the 2023 Fiscal Year.

94.    In its discussion of the Tinder's user growth over the first quarter, the Q1 2023 Shareholder Letter stated, *inter alia*:

> While Tinder is an iconic brand used by many, our data shows that approximately 40% of eligible singles age 18 to 34 in North America and Europe are still not using Tinder, and an additional approximately 35% have used Tinder previously, but not in the last year ("lapsed users"). This provides ample opportunity for Tinder to bring both singles who have never tried the app and lapsed users into the fold. ***Tinder has a strong history of reactivating***

*lapsed users, and the large pool of lapsed users provides significant opportunity to increase reactivations. The way for Tinder to attract new and lapsed users is to deliver exciting features and a product experience that resonates. We're confident that as Tinder does so, it can both return to stronger new user growth and reactivate the large population of lapsed users, which will ultimately drive revenue growth*.

### 2023 Proxy Statement

95.    On May 2, 2023, Match filed its Schedule 14A the Company filed with the SEC (the "2023 Proxy Statement"). Defendants Kim, Bailey, Brenner, Dubey, McDaniel, McInerney, Murdoch, Schiffman, Seymon, and Spoon solicited the 2023 Proxy Statement, which contained material misstatements and omissions.

96.    The 2023 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Dubey, McDaniel, and McInerney to the Board for a three year term; (2) approve, on an advisory basis, executive compensation; and (3) to ratify the appointment Ernst & Young LLP ("EY") as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

97.    Regarding the Company's "Corporate Governance Guidelines, Committee Charters, and Code of Business Conduct and Ethics," the 2023 Proxy Statement stated the following:

> As part of its ongoing commitment to good corporate governance, the Board has codified its corporate governance practices into a set of Corporate Governance Guidelines and has also adopted written charters for each of the committees of the Board. Match Group has also adopted a Code of Business Conduct and Ethics for directors, officers (including our principal executive officer, principal financial officer and principal accounting officer) and employees. The Corporate Governance Guidelines, Audit Committee Charter, Compensation and Human Resources Committee Charter, Nominating and Corporate Governance Committee Charter, and Code of Business Conduct and Ethics are available in the Corporate Governance section of our website at *http://ir.mtch.com*.

98.    Regarding "Risk Oversight," the 2023 Proxy Statement stated the following, in relevant part:

> The Board's role in risk oversight of the Company is consistent with Match

Group's leadership structure, with the Chief Executive Officer and other members of senior management having responsibility for assessing and managing the Company's risk exposure, and the Board and its committees providing oversight in connection with these efforts. Match Group management, including our Senior Vice President, Internal Audit, and our Risk, Controls and Compliance team, is responsible for assessing and managing Match Group's exposure to various risks on a day-to-day basis, which responsibilities include the conduct of an enterprise risk assessment of short-term, long-term and emerging risks, testing of key controls and procedures, and creation of appropriate risk management programs and policies. Management has developed and implemented guidelines and policies to identify, assess and manage significant risks facing the Company. In developing this framework, Match Group recognizes that leadership and success are impossible without taking risks; however, the imprudent acceptance of risks or the failure to appropriately identify and mitigate risks could adversely impact stockholder value. The Board is responsible for overseeing management in the execution of its responsibilities and for assessing Match Group's approach to risk management. While the Board's oversight focuses on all material risks, the Board may focus more frequently on immediate areas of concern that represent significant emerging risks as identified by management.

99.   Defendants Kim, Bailey, Brenner, Dubey, McDaniel, McInerney, Murdoch, Schiffman, Seymon, and Spoon caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was facing greater challenges in generating user growth for Tinder than was otherwise being represented; (2) because of this, there was a significant risk that Tinder's MAU would be unable to recover by the time the Company had to report its financial results for the third quarter of the 2024 Fiscal Year; and (3) Tinder was facing additional issues regarding its average revenue per user. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

100.   The 2023 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's

descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

101. As a result of Defendants Kim, Bailey, Brenner, Dubey, McDaniel, McInerney, Murdoch, Schiffman, Seymon, and Spoon causing the 2023 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Dubey, McDaniel, and McInerney to the Board for an additional three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on a non-binding advisory basis, the compensation of Match's executive officers; and (3) ratify the appointment of EY as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

### *February 23, 2024 Form 10-K*

102. On February 23, 2024, the Company filed its annual report on Form 10-K with the SEC for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants Kim, Swidler, McInerney, Bailey, Brenner, Dubey, McDaniel, Murdoch, Schiffman, Seymon, and Spoon and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Kim and Swidler attesting to the accuracy of the financial reporting, the disclosure of any material changes to Match's internal control over financial reporting, and the disclosure of all fraud.

103. The 2023 10-K discussed the Company's risk disclosures using generic, boilerplate language, notably not mentioning the ongoing risks associated with Tinder's user growth that were occurring at the time. The 2023 10-K stated the risk disclosure as:

> ***If we fail to retain existing users or add new users, our revenue, financial results, and business may be significantly harmed***.

> ***Our financial performance has been and will continue to be significantly determined by our success in adding and retaining users of our services***. In the past we have experienced, and expect to continue to experience, fluctuations in the size of our user base in one or more markets from time to time, particularly in markets where we have achieved higher penetration rates.

The size of our user base is also impacted by a number of other factors, including competitive products and services and global and regional business, macroeconomic, and geopolitical conditions. For example, wars in the Middle East and Ukraine have led to reduced supply as well as the decision to suspend our services in Russia.

***Further, if people do not perceive our services to be useful, we may not be able to attract or retain users***. In recent years, some users, particularly younger generations, have shown a decreased appetite for our services and those of our competitors due potentially to a number of factors. ***With each new generation of users, expectations of our services change and user behaviors and priorities shift***. As a result, we may need to further leverage our existing capabilities or advances in technologies like artificial intelligence ("AI"), or adopt new technologies, to improve our existing services or introduce new services in order to better satisfy existing users and to expand our penetration of what continues to be a large available new user market. However, there can be no assurances that further implementation of technologies like AI will enhance our services or be beneficial to our business and the introduction of new features or services to our existing services may have unintended consequences on our ecosystem, which could lead to fluctuations in the size of our user base. Additionally, in 2023 we began consolidating some of our legacy brands' platforms in order to decrease operating costs, which may result in changes to the user experience for some of our brands that some existing users may perceive negatively.

If we are unable to maintain or increase the size of our user base, our revenue and other financial results may be adversely affected. Further, as the size of our user base fluctuates in one or more markets from time to time, we may become increasingly dependent on our ability to maintain or increase levels of monetization in order to grow revenue. Any significant decrease in user retention or growth could render our services less attractive to users, which is likely to have a material and adverse impact on our business, financial condition, and results of operations.

***2024 Proxy Statement***

104.   On April 29, 2024, Match filed the 2024 Proxy Statement with the SEC. Defendants Kim, Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Murdoch, Rascoff, Schiffman, Seymon, and Spoon solicited the 2024 Proxy Statement, which contained material misstatements and omissions.

105.    The 2024 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Murdoch, Rascoff, Schiffman, and Seymon to the Board for a three-year term; (2) approve, on a non-binding advisory basis, the compensation of Match's executive officers; (3) approve the 2024 Stock Plan; and (4) ratify the appointment of EY as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

106.    The 2024 Proxy Statement explains that 2024 Stock Plan would be comprised of 6,000,000 shares and any shares otherwise available under the pre-existing 2017 Stock and Annual Incentive Plan. Upon the approval of the 2024 Stock Plan, it will replace the pre-existing 2017 Stock and Annual Incentive Plan would become ineffective. Should the 2024 EIP not be approved, shares would continue to be granted under the 2015 Stock and Annual Incentive Plan until the expiration of the 2015 Stock and Annual Incentive Plan in November 2025.

107.    Regarding the Company's "Corporate Governance Guidelines, Committee Charters, and Code of Business Conduct and Ethics," the 2023 Proxy Statement stated the following:

> As part of its ongoing commitment to good corporate governance, the Board has codified its corporate governance practices into a set of Corporate Governance Guidelines and has also adopted written charters for each of the committees of the Board. Match Group has also adopted a Code of Business Conduct and Ethics for directors, officers (including our principal executive officer, principal financial officer and principal accounting officer) and employees. The Corporate Governance Guidelines, Audit Committee Charter, Compensation and Human Resources Committee Charter, Nominating and Corporate Governance Committee Charter, and Code of Business Conduct and Ethics are available in the Corporate Governance section of our website at *http://ir.mtch.com*.

108.    Regarding "Risk Oversight," the 2023 Proxy Statement stated the following, in relevant part:

> The Board's role in risk oversight of the Company is consistent with Match Group's leadership structure, with the Chief Executive Officer and other members of senior management having responsibility for assessing and

managing the Company's risk exposure, and the Board and its committees providing oversight in connection with these efforts. Match Group management, including our Senior Vice President, Internal Audit, and our Risk, Controls and Compliance team, is responsible for assessing and managing Match Group's exposure to various risks on a day-to-day basis, which responsibilities include the conduct of an enterprise risk assessment of short-term, long-term and emerging risks, testing of key controls and procedures, and creation of appropriate risk management programs and policies. Management has developed and implemented guidelines and policies to identify, assess and manage significant risks facing the Company. In developing this framework, Match Group recognizes that leadership and success are impossible without taking risks; however, the imprudent acceptance of risks or the failure to appropriately identify and mitigate risks could adversely impact stockholder value. The Board is responsible for overseeing management in the execution of its responsibilities and for assessing Match Group's approach to risk management. While the Board's oversight focuses on all material risks, the Board may focus more frequently on immediate areas of concern that represent significant emerging risks as identified by management.

109. Defendants Kim, Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Murdoch, Rascoff, Schiffman, Seymon, and Spoon caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was facing greater challenges in generating user growth for Tinder than was otherwise being represented; (2) because of this, there was a significant risk that Tinder's MAU would be unable to recover by the time the Company had to report its financial results for the third quarter of the 2024 Fiscal Year; (3) Tinder was facing additional issues regarding its average revenue per user; and (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Stock Plan. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

110. The 2024 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers

or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

111.    As a result of Defendants Kim, Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Murdoch, Rascoff, Schiffman, Seymon, and Spoon causing the 2024 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Rascoff, Schiffman, and Seymon to the Board for an additional three-year term,[2] thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on a non-binding advisory basis, the compensation of Match's executive officers; (3) approve the 2024 Stock Plan; and (4) ratify the appointment of EY as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2024.

112.    As a result of the shareholders approving the 2024 Stock Plan, the 2024 Stock Plan replaced the pre-existing 2017 Stock and Annual Incentive Plan, with an additional 6,000,000 shares to disburse. As such, the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2024 Stock Plan in the future.

**May 8, 2024 Form 10-Q**

113.    On May 8, 2024, Match filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended March 31, 2024 (the "Q1 2024 10-Q"). The Q1 2024 10-Q was signed by Defendant Swidler and contained SOX certifications signed by Defendants Kim and Swidler attesting to the accuracy of financial reporting, the disclosure of any material changes to Match's internal control over financial reporting, and the disclosure of all fraud.

---

[2] Despite having been up for reelection, on June 2, 2024 Defendant Murdoch chose not to stand for reelection as a director and instead chose to step down at the Annual Meeting.

114.    The Q1 2024 10-Q incorporated the risk disclosures from the 2023 10-K outlined in ¶103 above.

*May 8, 2024 Earnings Call*

115.    That same day, the Company hosted an earnings call with investors to discuss the quarterly results for the first quarter (the "Q1 2024 Earnings Call"). On the Q1 Earnings Call, Defendant Kim discussed the issues the Company has experienced generating user growth on Tinder, understating the relevant issues. In full, Defendant Kim stated:

> Tinder's international scale and reach has never been matched by any other dating app. And it's critical that we keep the ecosystem vibrant. ***For example, Tinder took decisive action by changing its community guidelines and moderation practices mid-last year, which better enabled the removal of users who are not on the app for its intended purposes. While the improvements to the ecosystem and benefits to the brand are undeniable, these actions did contribute to some of Tinder's MAU declines over the past nine months.***
>
> We believe that actions like these are in the best interest of Tinder's long-term success. ***So we are willing to accept fewer MAU in the short-term*** to create a safer ecosystem and better outcomes for our daters. Diving a little deeper into Tinder, we have heard loud and clear that some users, especially the Gen Z cohort, are looking for more from their dating apps. We have been in this business a long time, and we have consistently adapted our offerings to best serve the needs of different generations and we understand and recognize that expectations of apps are changing.
>
> ***Tinder is working tirelessly to execute against their strategy, and I'm incredibly confident in the team's ability to satisfy these evolving expectations that users have. By the end of the year, we expect to have a significantly improved product.*** Similarly, pressures on discretionary consumer spending, especially among Tinder's younger user base, have negatively impacted Tinder's a la carte revenue. The team is doubling down on its efforts to improve the efficacy of its current ALC features and introduce new offerings at affordable price points. We expect to see improvements in ALC trends by the back half of the year. We know we have work to do to satisfy every new generation of daters. The Tinder team is working to improve the dating journey at every point of the experience. ***Through innovation, especially with AI, we believe we can improve the quality of profiles,***

*matching outcomes, safety features, and the post-match experience to make the entire Tinder platform more modern and deliver on their brand promise*.

I've asked our Chief Technology Officer and his central innovation team to work even more closely with Tinder's product team to expedite all these efforts which are underway. ***And given Tinder's vast scale and knowledge about relationships and dating, there is no dating app better positioned to take advantage of these advances in technology***. Tinder has become an industry defining highly profitable business over the past decade. We have been innovating to solve some of the user pain points. As a result, we will have a healthier, more satisfying, and ultimately more valuable experience for daters to enjoy.

***And I am confident that Tinder's momentum will come back. We believe we have real market opportunity and the right teams and strategies in place to get to that next level of growth***. And we are determined to deliver that for all of our stakeholders. We continue to see significant growth runway at Hinge and our emerging brands portfolio. ***We're executing on our turnaround plan for Tinder and our central innovation teams are bringing renewed vigor to product innovation***. We are excited to continue this work as giving people new, exciting ways to connect is what motivates us every day. And with that, let me turn it over to Gary.

***July 31, 2024 Earnings Call***

116.   On July 31, 2024, the Company hosted an earnings call with investors to discuss the quarterly results for the second quarter of the 2024 Fiscal Year (the "Q2 2024 Earnings Call"). On the Q2 2024 Earnings Call, Defendant Swidler discussed Tinder's declining MAU, but undersold the impact they really had on the Company, stating:

Focusing on user trends, we saw sequential stability in Tinder's MAU, which were down 9% year-over-year in Q2, as was the case in Q1. MAU at Tinder have now been relatively stable since March. ***A large decline in MAU began in July of last year, driven in large part by changes we made to Tinder's trust and safety policies to remove people who are not truly on the app to connect that has now begun to stabilize***.

With much of this impact now behind us and given Tinder's various ongoing product and marketing initiatives, ***we're confident Tinder's year-over-year MAU declines should continue to moderate as this year passes***.

117.   During his scripted remarks on the Q2 2024 Earnings Call, Defendant Kim

also underplayed the issues regarding Tinder's MAU, stating:

> Over the last several quarters, Tinder has been working hard to improve the user experience, and we're now starting to see initial signs of progress. User and payer trends are stabilizing, and we expect them to continue to improve from here. ***We expect strong sequential payer growth in Q3 and better year-over-year MAU trends in the second half of the year.***
>
> As the largest dating app in the world, it's Tinder's job to deliver for its users, which in turn helps attract new users. ***Tinder is building on its fun legacy and its iconic swipe experience by continuing to increase authenticity and realness and by setting the industry standard for trust and safety.*** We believe this will address some of the concerns that users have been vocal about more recently.

118.    During the question-and-answer portion of the Q2 2024 Earnings Call, Defendant Kim responded to a question regarding the stabilization of Tinder's user growth in the quarter, stating:

> *Nathan Feather – Morgan Stanley, Analyst*: Hey, everyone. ***Congrats on the stabilization and Tinder user growth in the quarter***. Is there anything outsized that led to that stabilization or more so stacking of a variety of individual improvements? And can you help us contextualize how much of that is due to new user trends versus retention? Thank you.
>
> *Defendant Kim*: Thanks, Nathan, for that question. I really like how you framed it around stacking Tinder product improvements. Our work is really a combination of product initiatives building on each other over time. And this is reinforced with really strong marketing that is helping drive stabilization and start contributing to improvements on the back half of this year. The trust and safety moves that we made last year are one of -- is a great example of stacking initiatives, which we know were the right decisions. And the good news is we've worked through a lot of those -- a lot of that noise and has led to better user outcomes and say that the user base has stabilized, retention is improving and growing and we're making strides in top of funnel again. It's a really exciting time period for Tinder.

### *August 1, 2024 Form 10-Q*

119.    On August 1, 2024, Match filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended June 30, 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-

Q was signed by Defendant Swidler and contained SOX certifications signed by Defendants Kim and Swidler attesting to the accuracy of financial reporting, the disclosure of any material changes to Match's internal control over financial reporting, and the disclosure of all fraud.

120.    The Q2 2024 10-Q incorporated the risk disclosures from the 2023 10-K outlined in ¶103 above.

121.    The statements referenced in ¶¶93-94, 102-103, and 113-120 above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company was facing greater challenges in generating user growth for Tinder than was otherwise being represented; (2) because of this, there was a significant risk that Tinder's MAU would be unable to recover by the time the Company had to report its financial results for the third quarter of the 2024 Fiscal Year; (3) Tinder was facing additional issues regarding its average revenue per user; and (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Stock Plan. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Emerges**

### *November 6, 2024 Shareholder Letter*

122.    The truth began to emerge on November 6, 2024 when the Company issued the Q3 2024 Shareholder Letter. The Q3 2024 Shareholder Letter disclosed that, despite the Company's assertions to the contrary, Tinder's MAU were down year-over-year in the third quarter, stating:

> Tinder MAU was down 9% Y/Y in Q3, which was the same rate of decline as in Q2, falling short of our expectations for continued improvement in Y/Y trends. From mid-September through October, we saw more pressure on new

users (registrations and reactivations) than we expected, which has led to pressure on MAU.

Tinder's primary focus remains driving its product transformation efforts forward to improve ecosystem health and user outcomes, which we believe are necessary for durable improvements in user, Payer, and revenue trends

### November 7, 2024 Investopedia Report

123.   The following day, on November 7, 2024, Investopedia published a report titled "Match Group Stock Slips as Fourth Quarter Outlook Disappoints." The report revealed a decline in the Company's share price as a result of the disappointing revelation in the Q3 2024 Shareholder Letter regarding Tinder's MAU, despite strong performance from Hinge, stating:

Shares of online dating giant [Match] tumbled Thursday morning despite a third-quarter earnings beat released after the bell Wednesday.

\* \* \*

Revenue and downloads of Hinge continued to grow, ***but Match said Tinder Direct revenue came in below its own expectations, as the app's monthly active users (MAUs) declined 9% from the same time last year and its revenue per payer (RPP) grew less than expected. Some new features tested with Tinder users in the quarter negatively impacted subscription revenue, which the company said will likely also have an impact on fourth quarter revenue***.

### November 7, 2024 Earnings Call

124.   The truth fully emerged on November 7, 2024, when the Company hosted an earnings call with investors and analysts to discuss the third quarter results (the "Q3 2024 Earnings Call"). On the Q3 20242 Earnings Call, Defendant Kim addressed the elephant in the room that was the Tinder MAU issue, stating:

As I mentioned during our last call, shareholders rightfully expect both short and long-term results. In the short-term, Tinder's direct revenue was slightly below our expectations driven by the under delivery of certain optimizations. However, Tinder added 311,000 payers sequentially and declined by only 4% year-over-year. This was well above our outlook provided in late July.

*While we're pleased with the results on payers, we saw less progress on Tinder MAU than we expected.* Tinder remains focused on the longterm testing several important new features aimed at cleaning up its ecosystem and improving user outcomes. This includes testing mandated face photos in several markets.

* * *

We're pleased with the progress we've seen recently at Tinder on product execution, but are far from done. The team is working tirelessly pushing forward with initiatives to drive Tinder's transformation forward. *At the same time, we're clear eyed that Tinder's progress will not always be linear because we know that transformation, such as these, take time.*

125.    Defendant Swidler also touched upon the Tinder MAU situation during his own scripted remarks on the Q3 2024 Earnings Call, stating:

Tinder MAU were down 9% in the quarter consistent with Q2 trends. *We had expected to see improvement in year-over-year MAU trends in the quarter. However, in mid-September, we began to see weaker new user trends, which includes new registrations and reactivations of lapsed users than is typical at this time of year, a trend that has stabilized in October.*

The pressure on new users was largely confined to iOS. We are working collaboratively with Apple to investigate whether it's related to the introduction of iOS 18 in mid-September, certain trust and safety enhancements we made or another cause. *This in turn has caused pressure on Tinder MAU.* We are working on a number of initiatives to improve this trend.

126.    Lastly, during the question-and-answer portion of the Q3 2024 Earnings Call, Defendant Kim responded to a question regarding what was going on with Tinder, stating:

*Ross Sandler – Barclays – Analyst*: Great. So I guess, Gary, starting with the Tinder top of funnel trends, could you just elaborate a little bit more on what's going on? You mentioned iOS and a few other things around top of funnel and the weaker MAU at the end of 3Q and then what's happening right now in 4Q? And as we turn ahead to '25, other than cranking on marketing, what other trends might help drive top of funnel at Tinder? And I guess it's related to this, did you feel like Tinder's operating margin at 52% is at the right level or how do we think about that long-term? Thank you.

*Defendant Kim*: Thanks, Ross. This is BK. I'm going to handle the first part of that question and Gary can jump in on the margin side. So we did see a step back in Tinder's MAU growth starting in mid-September. And as Gary

mentioned in his comments, we're investigating several possible causes. This includes the introduction of iOS 18 and some recent trust and safety enhancements that may have added to friction for daters. While I believe this step back isn't what we wanted, we don't see this as a longterm structural shift. Our team's top priority remains driving product innovation and that's where Tinder's focus is. We know we need to clean up the ecosystem and create better experiences, especially for younger users and women and we're working on it, but meaningful changes do take time. Now you mentioned marketing and it's definitely key to reinforce Tinder's brand and promoting new products. But marketing alone will not drive top of funnel growth. That's why our focus is on product-led strategies to build sustainable engagement. We're excited for Investor Day, so we can lay out our product roadmap and discuss our plans to get Tinder back on track. We're confident in these plans.

127.    On this news, the price per share of Match's stock fell $0.96 per share, or 1.85%, from a closing price of $51.78 per share on July 24, 2024 to close at $50.82 per share on July 25, 2024. It continued to fall an additional $0.99 per share, or 1.9%, to close at $49.83 per share on July 26, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

128.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $723 million to repurchase approximately 18,739,201 shares of its own common stock at artificially inflated prices from May 2023 and September 2024.

129.    According to the Form 10-Q the Company filed with the SEC on August 3, 2023 for the quarterly period ended June 30, 2023 (the "Q2 2023 10-Q"), between May 1, 2023 and May 31, 2023, the Company repurchased 1,024,118 shares of its own common stock at an average price per share of approximately $31.84, for a total cost to the Company of approximately $32,607,917.

130.    As the Company's stock was actually worth only $31.11 per share, the price at closing on November 7, 2024, the Company overpaid by approximately $747,606 for repurchases of its own stock between May 1, 2023 and May 31, 2023.

131. According to the Form 10-Q the Company filed with the SEC on November 2, 2023 for the quarterly period ended September 30, 2023 (the "Q3 2023 10-Q"), between August 1, 2023 and August 31, 2023, the Company repurchased 6,000,000 shares of its own common stock at an average price per share of approximately $44.81 per share, for a total cost to the Company of approximately $268,860,000.

132. As the Company's stock was actually worth only $31.11 per share, the price at closing on November 7, 2024, the Company overpaid by approximately $82,200,000 for repurchases of its own stock between August 1, 2023 and August 31, 2023.

133. According to the Q3 2023 10-Q, between September 1, 2023 and September 30, 2023, the Company repurchased 667,465 shares of its own common stock at an average price per share of approximately $46.62 per share, for a total cost to the Company of approximately $31,117,218.

134. As the Company's stock was actually worth only $31.11 per share, the price at closing on November 7, 2024, the Company overpaid by approximately $10,352,382 for repurchases of its own stock between September 1, 2023 and September 30, 2023.

135. According to the 2023 10-K, between December 1, 2023 and December 31, 2023, the Company repurchased 829,396 shares of its own common stock at an average price per share of approximately $32.64 per share, for a total cost to the Company of approximately $27,071,485.

136. As the Company's stock was actually worth only $31.11 per share, the price at closing on November 7, 2024, the Company overpaid by approximately $1,268,976 for repurchases of its own stock between December 1, 2023 and December 31, 2023.

137. According to the Q1 2024 10-Q, between February 1, 2024 and February 29, 2024, the Company repurchased 1,917,899 shares of its own common stock at an average price per share of approximately $36.42 per share, for a total cost to the Company of approximately $69,849,882.

138. As the Company's stock was actually worth only $31.11 per share, the price

at closing on November 7, 2024, the Company overpaid by approximately $10,184,044 for repurchases of its own stock between February 1, 2024 and February 29, 2024.

139.    According to the Q1 2024 10-Q, between March 1, 2024 and March 31, 2024, the Company repurchased 3,699,120 shares of its own common stock at an average price per share of approximately $34.54 per share, for a total cost to the Company of approximately $127,767,605.

140.    As the Company's stock was actually worth only $31.11 per share, the price at closing on November 7, 2024, the Company overpaid by approximately $12,687,982 for repurchases of its own stock between March 1, 2024 and March 31, 2024.

141.    According to the Q2 2024 10-Q, between April 1, 2024 and April 30, 2024, the Company repurchased 65,845 shares of its own common stock at an average price per share of approximately $36.05 per share, for a total cost to the Company of approximately $2,373,712.

142.    As the Company's stock was actually worth only $31.11 per share, the price at closing on November 7, 2024, the Company overpaid by approximately $325,274 for repurchases of its own stock between April 1, 2024 and April 30, 2024.

143.    According to the Form 10-Q the Company filed with the SEC on November 12, 2024 for the quarterly period ended September 30, 2024 (the "Q3 2024 10-Q"), between August 1, 2024 and August 31, 2024, the Company repurchased 1,933,412 shares of its own common stock at an average price per share of approximately $35.55 per share, for a total cost to the Company of approximately $68,732,797.

144.    As the Company's stock was actually worth only $31.11 per share, the price at closing on November 7, 2024, the Company overpaid by approximately $8,584,349 for repurchases of its own stock between August 1, 2024 and August 31, 2024.

145.    According to the Q3 2024 10-Q, between September 1, 2024 and September 30, 2024, the Company repurchased 2,601,946 shares of its own common stock at an average price per share of approximately $36.36 per share, for a total cost to the Company

of approximately $94,606,757.

146.    As the Company's stock was actually worth only $31.11 per share, the price at closing on November 7, 2024, the Company overpaid by approximately $13,660,217 for repurchases of its own stock between September 1, 2024 and September 30, 2024.

147.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $140 million.

## DAMAGES TO MATCH

148.    As a direct and proximate result of the Individual Defendants' conduct, Match has lost and will continue to lose and expend many millions of dollars.

149.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

150.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

151.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

152.    Such losses include the Company's overpayment of over $140 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

153.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

154.    As a direct and proximate result of the Individual Defendants' conduct, Match has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

155.    Plaintiff brings this action derivatively and for the benefit of Match to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Match, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 10(b), 20(a), and 14(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

156.    Match is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

157.    Plaintiff is, and has been at all relevant times, a shareholder of Match. Plaintiff will adequately and fairly represent the interests of Match in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

158.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

159.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Match's Board consisted of the following eleven individuals: Defendants Kim, Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Murdoch, Rascoff, Schiffman, Seymon, and Spoon (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of the eleven Director-Defendants that were on the Board at the time this action was filed.

160.    Demand is excused as to all of the Director-Defendants because each one of

them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

161.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Match to issue materially false and misleading statements. Specifically, the Director-Defendants caused Match to issue false and misleading statements which were intended to make Match appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

162.    Moreover, Defendants Kim, Bailey, Brenner, Dubey, McDaniel, McInerney, Murdoch, Schiffman, Seymon, and Spoon solicited the 2023 Proxy Statement, which called for a shareholder vote to, *inter alia*, re-elect Defendants Dubey, McDaniel, and McInerney to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company.

163.    All of the Director-Defendants solicited the 2024 Proxy Statement, which called for a shareholder vote to, *inter alia*, re-elect Defendants Rascoff, Schiffman, and Seymon to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company.

164.    In addition, the Director-Defendants caused the 2024 Proxy Statement to call for a shareholder vote to approve the 2024 Stock Plan, which made shares available to employees and directors of the Company. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2024 Stock Plan, who would

not have approved the 2024 Stock Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2024 Stock Plan at the annual meeting of stockholders of Match on June 21, 2024, the then-existing plan would have terminated in November 2025. After the shareholders approved the 2024 Stock Plan, 6,000,000 additional shares were made available under the plan (plus the remaining shares from the pre-existing plan) and the 2024 Stock Plan was effective for an additional ten years. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits they otherwise would not receive but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Stock Plan pursuant to the 2024 Proxy Statement. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

165.   Additional reasons that demand on Defendant Braunstein is futile follow. Defendant Kim has been the Company's CEO and a director since May 2022. The Company provides Defendant Kim with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. Additionally, Defendant Kim solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Dubey, McDaniel, and McInerney to the Board for a three-year term, allowing them to continue to breach their fiduciary duty to the Company. Moreover, Defendant Kim solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Rascoff, Schiffman, and Seymon to the Board for a three-year term, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 Stock Plan. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to

correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Further, Defendant Kim is a defendant in the Securities Class Action. Moreover, under the 2024 Stock Plan, Defendant Kim is eligible to receive stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Kim breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on Defendant Bailey is futile follow. Defendant Bailey has served as a Company director since June 2020. Defendant Bailey also serves as a member of the Audit Committee, and will take over as CFO of the Company on March 1, 2025. Additionally, Defendant Bailey solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Dubey, McDaniel, and McInerney to the Board for a three-year term, allowing them to continue to breach their fiduciary duty to the Company. Moreover, Defendant Bailey solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Rascoff, Schiffman, and Seymon to the Board for a three-year term, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 Stock Plan. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Bailey is eligible to receive stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Bailey breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167.    Additional reasons that demand on Defendant Brenner is futile follow. Defendant Brenner has served as a Company director since June 2020. Defendant Brenner also serves as a member of the Compensation Committee. Additionally, Defendant Brenner solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Dubey, McDaniel, and McInerney to the Board for a three-year term, allowing them to continue to breach their fiduciary duty to the Company. Moreover, Defendant Brenner solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Rascoff, Schiffman, and Seymon to the Board for a three-year term, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 Stock Plan. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Brenner is eligible to receive stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Brenner breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

168.    Additional reasons that demand on Defendant Dubey is futile follow. Defendant Dubey has served as a Company director since September 2019. Additionally, Defendant Dubey solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants McDaniel, McInerney, and herself to the Board for a three-year term, allowing them to continue to

breach their fiduciary duty to the Company. Moreover, Defendant Dubey solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Rascoff, Schiffman, and Seymon to the Board for a three-year term, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 Stock Plan. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Dubey is eligible to receive stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Dubey breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

169. Additional reasons that demand on Defendant Jones is futile follow. Defendant Jones has served as a Company director since March 2024. Moreover, Defendant Jones solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Rascoff, Schiffman, and Seymon to the Board for a three-year term, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 Stock Plan. As a trusted director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Jones is eligible to receive stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan.

For these reasons, too, Defendant Jones breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

170.    Additional reasons that demand on Defendant McDaniel is futile follow. Defendant McDaniel has served as a Company director since December 2015. Defendant McDaniel also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Additionally, Defendant McDaniel solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Dubey, McInerney, and herself to the Board for a three-year term, allowing them to continue to breach their fiduciary duty to the Company. Moreover, Defendant McDaniel solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Rascoff, Schiffman, and Seymon to the Board for a three-year term, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 Stock Plan. Furthermore, Defendant McDaniel engaged in lucrative insider trading, reaping personal profits of approximately $400,255. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant McDaniel is eligible to receive stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant McDaniel breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

171.    Additional reasons that demand on Defendant McInerney is futile follow.

Defendant McInerney has served as the Chairman of the Board since May 2021, and as a Company director since November 2015. Defendant McInerney also serves as the Chair of the Nominating and Governance Committee. Additionally, Defendant McInerney solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Dubey, McDaniel, and himself to the Board for a three-year term, allowing them to continue to breach their fiduciary duty to the Company. Moreover, Defendant McInerney solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Rascoff, Schiffman, and Seymon to the Board for a three-year term, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 Stock Plan. As the trusted, long-time Chairman of the Board, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant McInerney is eligible to receive stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant McInerney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172. Additional reasons that demand on Defendant Rascoff is futile follow. Defendant Rascoff has served as a Company director since March 2024. Moreover, Defendant Rascoff solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Schiffman, Seymon, and himself to the Board for a three-year term, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 Stock Plan. As a trusted director, he conducted little, if any, oversight of the scheme to make

and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Rascoff is eligible to receive stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Rascoff breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.   Additional reasons that demand on Defendant Schiffman is futile follow. Defendant Schiffman has served as a Company director since September 2016. Defendant Schiffman also serves as a member of the Audit Committee. Additionally, Defendant Schiffman solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Dubey, McDaniel, and McInerney to the Board for a three-year term, allowing them to continue to breach their fiduciary duty to the Company. Moreover, Defendant Schiffman solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Rascoff, Seymon, and himself to the Board for a three-year term, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 Stock Plan. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Schiffman is eligible to receive stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Schiffman breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Seymon is futile follow. Defendant Seymon has served as a Company director since November 2015. Defendant Seymon also serves as a member of the Compensation Committee. Additionally, Defendant Seymon solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Dubey, McDaniel, and McInerney to the Board for a three-year term, allowing them to continue to breach their fiduciary duty to the Company. Moreover, Defendant Seymon solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Rascoff, Schiffman, and herself to the Board for a three-year term, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 Stock Plan. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Seymon is eligible to receive stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Seymon breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Spoon is futile follow. Defendant Spoon has served as a Company director since November 2015. Defendant Spoon also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Additionally, Defendant Spoon solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to

the re-election of Defendants Dubey, McDaniel, and McInerney to the Board for a three-year term, allowing them to continue to breach their fiduciary duty to the Company. Moreover, Defendant Spoon solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Rascoff, Schiffman, and Seymon to the Board for a three-year term, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 Stock Plan. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Spoon is eligible to receive stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Spoon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on the Board is futile follow.

177.    Defendants Spoon (as Chair), Bailey, and Schiffman served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight

of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

178.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

179.   Match has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Match any part of the damages Match suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

180.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of

the Company. Accordingly, demand is excused as being futile.

181.   The acts complained of herein constitute violations of fiduciary duties owed by Match's officers and directors, and these acts are incapable of ratification.

182.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Match. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Match, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

183.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Match to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

184.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**
### **Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

185.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

187.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

188.   Under the direction and watch of Defendants Kim, Bailey, Brenner, Dubey, McDaniel, McInerney, Murdoch, Schiffman, Seymon, and Spoon, the 2023 Proxy Statement failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors were adhering to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

189.   The 2023 Proxy Statement also failed to disclose that: (1) the Company was facing greater challenges in generating user growth for Tinder than was otherwise being represented; (2) because of this, there was a significant risk that Tinder's MAU would be

unable to recover by the time the Company had to report its financial results for the third quarter of the 2024 Fiscal Year; and (3) Tinder was facing additional issues regarding its average revenue per user. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

190.    In the exercise of reasonable care, Defendants Kim, Bailey, Brenner, Dubey, McDaniel, McInerney, Murdoch, Schiffman, Seymon, and Spoon should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the reelection of Defendants Dubey, McDaniel, and McInerney to the Board.

191.    As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted, *inter alia*, to reelect Dubey, McDaniel, and McInerney to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company.

192.    The Company was damaged as a result of the Defendants Kim, Bailey, Brenner, Dubey, McDaniel, McInerney, Murdoch, Schiffman, Seymon, and Spoon's material misrepresentations and omissions in the 2023 Proxy Statement.

193.    Under the direction and watch of Defendants Kim, Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Murdoch, Rascoff, Schiffman, Seymon, and Spoon, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors were adhering to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

194.   The 2024 Proxy Statement also failed to disclose that: (1) the Company was facing greater challenges in generating user growth for Tinder than was otherwise being represented; (2) because of this, there was a significant risk that Tinder's MAU would be unable to recover by the time the Company had to report its financial results for the third quarter of the 2024 Fiscal Year; (3) Tinder was facing additional issues regarding its average revenue per user; and (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Stock Plan. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

195.   In the exercise of reasonable care, Defendants Kim, Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Murdoch, Rascoff, Schiffman, Seymon, and Spoon should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to, the reelection of Defendants Rascoff, Schiffman, and Seymon to the Board, and the approval of the 2024 Stock Plan.

196.   As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders voted, *inter alia*, to reelect Defendants Rascoff, Schiffman, and Seymon to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company, and to approve the 2024 Stock Plan.

197.   The Company was damaged as a result of the Defendants Kim, Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Murdoch, Rascoff, Schiffman, Seymon, and Spoon's material misrepresentations and omissions in the 2024 Proxy Statement.

198.   Plaintiff, on behalf of Match, has no adequate remedy at law.

**SECOND CLAIM**

1

2

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

3

4

199.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

5

6

7

8

9

10

11

12

200.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Match. Not only is Match now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Match by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *18,739.201* of its own shares at artificially inflated prices, damaging Match.

13

14

15

16

17

201.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

18

19

20

21

22

23

202.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Match not misleading.

24

25

26

27

28

203.    The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top

executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

204.   By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## THIRD CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

205.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

206.   The Individual Defendants, by virtue of their positions with Match and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Match and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Match to engage in the illegal conduct and practices complained of herein.

207.   Plaintiff, on behalf of Match, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

208.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Match's business and affairs.

210.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

211.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged

herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Match.

212.    In breach of their fiduciary duties owed to Match, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was facing greater challenges in generating user growth for Tinder than was otherwise being represented; (2) because of this, there was a significant risk that Tinder's MAU would be unable to recover by the time the Company had to report its financial results for the third quarter of the 2024 Fiscal Year; (3) Tinder was facing additional issues regarding its average revenue per user; and (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Stock Plan. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

213.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

214.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

215.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $400,255.

216.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual

knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Match's securities.

217.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Match's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

218.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

219.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Match has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

220.    Plaintiff, on behalf of Match, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

221.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

222.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Match.

223.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Match that was tied to the performance or artificially inflated valuation of Match, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

224.   Plaintiff, as a shareholder and a representative of Match, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

225.   Plaintiff, on behalf of Match, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

226.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

227.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Match, for which they are legally responsible.

228.   As a direct and proximate result of the Individual Defendants' abuse of control, Match has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

229.   Plaintiff, on behalf of Match, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

230.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

231.  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Match in a manner consistent with the operations of a publicly held corporation.

232.  As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Match has sustained and will continue to sustain significant damages.

233.  As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

234.  Plaintiff, on behalf of Match, has no adequate remedy at law.

## EIGHTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

235.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236.  The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

237.  As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Match to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

238.  In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the

Company's assets.

239.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

240.   Plaintiff, on behalf of Match, has no adequate remedy at law.

## NINTH CLAIM

### Against Defendants Kim and Swidler for Contribution Under Sections 10(b) and 21D of the Exchange Act

241.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

242.   Match, Defendant Kim, and Defendant Swidler are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Kim's and Defendant Swidler's willful and/or reckless violations of their obligations as officers and/or directors of Match.

243.   Defendants Kim and Swidler, because of their positions of control and authority as CEO and President/CFO of Match, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Match, including the wrongful acts complained of herein and in the Securities Class Action.

244.   Accordingly, Defendants Kim and Swidler are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

245.   As such, Match is entitled to receive all appropriate contribution or indemnification from Defendants Kim and Swidler.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor

against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Match, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Match;

(c)    Determining and awarding to Match the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Match and the Individual Defendants to take all necessary actions to reform and improve Match's corporate governance and internal procedures to comply with applicable laws and to protect Match and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Match to nominate at least six candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Match restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and

proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 20, 2024            Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I, Anand Roy, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

19    I declare under penalty of perjury that the foregoing is true and correct.  Executed this __ day of December, 2024.

DocuSigned by:

*Anand Roy*

241669D10B9A4F5...

Anand Roy